I'll go to the podium. R. James Kravitz, Fox Rothschild LLP. With me is my colleague at council table, Christine Soares. We represent Joseph Oat Holdings Inc., Biothane Corporation, Robert Sachs, Michael Holt, Greg Rosenberger, Martin Kaplan, Ronald Kaplan, John Murphy, and RCM Biothane LLC, who are the plaintiffs, counterclaim defendants, and the appellants. If I could attempt to reduce the question presented even narrower than we did in our briefs, I would present it this way. The question before the court is whether litigants in the federal court system can be held liable under state laws for taking action that they're required to take under the federal rules of civil procedure. I think the answer to that question has to be yes, whether that's based upon simply applying the rules, the Supremacy Clause, the cases that interpret duties to make and preserve e-discovery. You made a novel argument in your brief that talked about preemption from federal rules. This is what you're getting to here. Well, our argument is simply that if you have an obligation, let me take this, if you have an obligation to preserve documents under the federal rules and you do that, you shouldn't be held liable under state tort theories. That's the argument. But the state law here said the California-New Jersey laws are premised upon unauthorized and taking without permission. So how do you get from we believed that we had an obligation under law to these were authorized and we had permission? Are you saying that under California and New Jersey law, there is an exception or there is a provision that if you are, if you believe in good faith that you are complying with a federal procedural rule, that that translates under that state law to permission or authorization? What I believe we're saying, Your Honor, is under the facts of this case, what happened here is the parties entered into an agreement that's undisputed on separate the business and to dissolve it. A week later, Mr. Moser repudiated that. He continued to operate the business, which is we refer to as RCM Biothane, for the next several months. At some point, he pivoted again and said he's winding it down. After we went into court and obtained an injunction against him using the Biothane trade name, he pivoted yet again and said, I'm winding it down. And at some point, he then cut the cord, said, I'm not operating it. The data that was being preserved was in late October. At that point in time, Mr. Moser had represented to us, both by himself and his counsel, that there was no separation agreement and that he was continuing to operate the business. This is RCM Biothane, who's one of the petitioners, he or appellants. He was paying his payroll. He was incurring debts in Biothane's name, RCM Biothane's name. I realize all that, but the only thing that is on appeal before us is an injunction. Correct. And that's how you're here. Entered, based upon the California and New Jersey laws, that enjoins use of anything post-August 6th and declares that there was a violation of those laws. And I get back to my question. You say you had an obligation under federal rules. I'm saying, how does that, your purpose or your intent or your reason, how does that accept you from state laws saying you cannot, without permission or in an unauthorized way, do what you did? Because it isn't unauthorized. Because if you have an obligation to preserve documents that you control, and I think those are the facts of this case, not that we had access to them, Biothane, Joseph O., controlled the computer system. That's clear. But these were post-August 6th documents. They were, but the post-August 6th documents, according to Mark Moser's deposition testimony, were business transactions in the name of RCM Biothane. He testified that from August 6th until late October, he continued to transact business in the name of RCM Biothane. So if he's transacting business in RCM Biothane on our computer system and we control it, we have an obligation to preserve it. And as a result of that, that is not an unauthorized invasion, so to speak, or use of someone else's computer data under state law. So if I have something in my house that is arguably, arguably belongs to me and arguably belongs to you, you can, even though I don't give you permission, you can come into my house and take it? No, Your Honor. And also, I just noticed, I realized I didn't request, I realized I didn't request three minutes of rebuttal. I apologize. Thank you. I realized that sort of analogy was made below. It's been made here. But that's just, in all due respect, Your Honor, that just isn't a fair analogy. The situation here was a little more complicated than this is his house and our house. This was a computer system where somebody in Camden could turn a switch on and observe everything, whether it's being preserved in Oakland or elsewhere. We would respectfully submit that that is overly simplistic. And that may be an analogy and a simple conversion claim involving goods and chattels. But with a computer system that we not only had access to, that we controlled, we don't think that's a fair analogy. Their expert has submitted a report, which is in the record, in which he points out that we had the administrative passwords. We could deny Mr. Moser access. So I think under those circumstances, it's just not the appropriate way to describe it. Let me ask a different question in a different area. What is the status of the case right now? Where are you? There is a court conference set in late October to argue some of the motions in Limine and to set a trial date. And the underlying issue is the validity of the separation agreement, what it says. Is that right? That's correct, Your Honor. And the district judge, as I understand it, declined to rule on the validity of the separation agreement. He denied our motion, that's correct. Okay, but he will be ruling on that. Eventually he'll be ruling. That issue is, according to district court, is for the jury to determine. Okay, well, the fact finder will make that determination. So what we have is was issued. And we're being asked to determine what, in my mind, is essentially a discovery dispute. And I'm wondering, just trying to think if this is a paradigm for the future in these kinds of cases where litigants are going to come up on appeal because they ask for and receive an injunction. If the district judge had made a decision here purely on the rules, discovery rules, there'd be no interlocutory appeal. You could raise it after judgment had been rendered. So my question is, are we going to be getting cases like this where there are essentially discovery disputes that the district judge can well handle under the rules of civil procedure, but where causes of action are going to be brought based on the anti-hacking laws, federal and state, which raise, as has been mentioned, some very, very complicated problems about preemption and so forth? Is this, I know it's a rhetorical question, but is this what we're going to be facing in the next several years? Well, I think you could, Your Honor, if district courts hold litigants liable for these computer protection statutes for what, and I think you're correct, it's essentially a discovery issue. And I think the appropriate way that it should have been to deal with this would have been the way the magistrate judge dealt with it. In other words, Mr. Moser did file a motion for sanctions. Correct. And we would submit that as appropriate recourse when somebody preserves data, which they contend is pursuant to the discovery rules. And if that's the case, you're not going to be having these cases if the courts treat it as a discovery issue and sanction litigants that they think they've acted improperly. But if the courts treat it as a cause of action where you've engaged in activities through the legal process, then I think, yes. So I think the answer to your question is if this decision is upheld, you will be faced with a number of these decisions because district courts will have the ability to hold people liable, enter injunctions against them, preclude them from reviewing documents that, in this case, we would like to have reviewed for trial, that we would like to use for tax purposes or for labor issues. And I think that's the second central issue here is why I think this is an important case. Because this should have been dealt with as a discovery issue. Is there anything the district court did here that he couldn't have done under the discovery rules in terms of denying the use of evidence and all of that sort of stuff? Sanctions? Well, they could have concluded, yes, they could have concluded that you went further than that. The district court held us liable under these state statutes and entered injunctions. So that really is the problem. And the second problem is, in this case, obviously this doesn't concern you as much, is obviously we're going to have the stigma of a determination that they violated, in this case, this California criminal statute for preserving data. And again, Your Honor, I haven't mentioned this, but I know it's the focus of the district court's decision was that RCM biothane ceased to exist on August 7th and that it engaged in no activity after that. And that's what underwrote the court's decision. Whether I've articulated the argument correctly as one of preemption, namely federal rules, or whether it should be simply dealt with as a mistake in fact-finding. Because if you strip away the district court's... Well, there shouldn't be fact-finding on summary judgment, correct? Correct. And that's really your argument, isn't it? That this was laden with disputed facts and so really wasn't appropriate for summary judgment. That's our second. Our first argument is it's wrong as a matter of law and there can be no liability whatsoever for doing what we did, whether it's preemption, which Judge Fischer thinks is not a great argument, or... It's not that I don't think it's a great argument. I just have never seen anybody try to argue that federal rules could preempt state law. It's a very steep hill. That's a steep hill to get up. Whether it is the federal rules, whether it is a litigation privilege, we respectfully submit... I couldn't find any authority one way or the other on it. But I think the court has the inherent power to control the conduct... And I see I'm out of time. The court has the inherent power to control the conduct of its litigants. And in this case, rather than imposing a tort theory for actions that litigants took during the litigation, in furtherance of the litigation, what they thought were their obligations, I think federal law should preclude state theories. And I think secondarily, the litigation privilege, which has been held to apply to conduct, not just statements, should also immunize litigants. And I think, Your Honor, you're correct that unless issues like this are dealt with as discovery issues, you are going to have these cases come up. Unless... Good. Thank you very much. Maybe Mr. Duda will disagree with that and we'll hear from him. Good morning. Good morning, Your Honor. My name is James Duda. I represent RCM Digesters, Inc. and Mark Moser, the police, in this matter. Your Honor, since August 7th of 2006, the computer claim defendants, who Mr. Kravitz represents, have insisted that the parties agreed on that date to stop doing business together, and that Mr. Moser has since that date been carrying on a business separate from them. They have insisted on that since that date. They have further insisted that as of August 7th, 2006, RCM Biothane had no assets. They have stated that. They have filed documents with the Internal Revenue Service to that effect, that the RCM Biothane had no assets, including no computer hardware or computer software. But haven't you contended that he's continued to operate? No. No, Your Honor. What we have... I mean, isn't that really disputed as to everything that's actually been going on during this post-August 6th period? That's where I think the confusion is being brought into this matter, is the issue of the dissolution of RCM Biothane and whether or not Mr. Moser was carrying on a business separate from the other parties. Or not. Whether he was or whether he wasn't. Well, exactly. But on the first one, whether he was, that is not what's in dispute. I would say that there is no dispute in the record that no rational person, based on the record that was before Judge Hillman, could have concluded other than the way that he did, which was that Mr. Moser was carrying on a business separate from the computer claim defendants after August 7th, 2006. And I don't think there's any evidence in the record that contradicts that. There isn't a single business transaction that happened after August 7th, 2006, in which the Biothane parties, the computer claim defendants, were involved with Mr. Moser. There is no business transaction that Mr. Moser was involved in after that date that involved those parties. What is clear, of course, is that the parties agreed on August 7th to dissolve this RCM Biothane. It didn't just disappear, as Judge Hillman recognized in his opinion. To this day, it still exists as a legal entity. But it had to be wound down. There had to be a transition. But from that date on, Mr. Moser operated separately. He did not work with these people anymore. And that's the point. The point is that from that date on... Tom, in the underlying action on the separation agreement, you alleged that there was not a valid separation agreement. And the court agreed with you in the March 31st order. That's correct. Now your argument was, before the court on this case, that there was a valid separation agreement. That is not what we're arguing, Your Honor. What we are arguing is exactly what Judge Hillman groomed, which is that... Didn't the court have to find that? Well, I'm sorry, I don't understand your question. Didn't the court have to find that there was a valid separation agreement? No. To grant the relief you requested? No. But what Judge Hillman found, which is absolutely correct, and all the parties agree, is that on August 7th, they agreed to separate. And they went their separate ways. Whether the separation agreement is the embodiment of that agreement, whether that's a valid agreement, whether it validly reflects it, I don't know. And that still needs to be tried to the court. But he necessarily decided that, as to anything after August 6th, there was no right to access any documents. And if what you're saying is correct, and there wasn't a valid separation agreement, then things continued status quo. Why don't we have here just so many facts that summary judgment just couldn't be entered as to authorization and permission? Because it's so intertwined with the whole issue of, what did this separation agreement do? What was the understanding of the parties as to what the deal was after August 6th? But what I'm saying, Your Honor, I think what Judge Hillman found is that whatever the separation agreement says, whatever it says, Mr. Moser, from that day on, went and conducted his own business. No matter what that separation agreement says. And the parties recognized it. They insisted again and again that Mr. Moser was operating his own business after that day. Okay, but how can you say categorically there was nothing in the computer system after August 6th that they did not have some right to access to? How can you categorically say that, given the facts? Because that's where we go to this sort of definitional semantic problem that I think Judge Hillman recognized. And that is this term, joint computer system. It was a joint computer system because there was something called a virtual private network, something that goes through the internet, which allowed the officers and people in Camden to access data files in Oakland, in the RCM offices in Oakland. That was a VPN. That was a joint system. It was not like this combined meshed thing. There was a server out there that belonged to RCM Digesters, became the property of RCM Biothane. And on August 7th, according to the plaintiffs and according to us and according to everybody else, that server went back to RCM Digesters. And they owned it. Didn't you, in essence, put the privacy of that server in question by challenging the validity of the separation agreement? If you had said, okay, there's a separation agreement that Oakland server is ours, you have no access to it, I think you'd be on solid footing. But you challenged the separation agreement. You got an Oakland server. It's like my computer in Pittsburgh on a court VPN. I'm still a member of the court. The court has access to my server. Why doesn't RCM Biothane continue to have access to your server in Oakland that you want to say they couldn't look at? Your Honor, there's... It seems to me your position is so contradictory, it defeats what you were trying to preserve, and that was privacy. Well, I don't believe so, Your Honor, because as of September 2006, the court issued an order that said Mr. Moser cannot operate RCM Biothane, cannot operate that company. There was an order... When was that? That was in September 26th, I believe, 2006, in September 2006, well before the copying started. Mr. Moser cannot operate RCM Biothane. Based on the representations that the computer claim defendants made, that he was operating his own separate business, and the court essentially said you have to operate your own separate business. You cannot operate RCM Biothane. That was clear, and we received letters from... Let's suppose, after that order, that they came in with a discovery request to be able to access the Oakland server. What would have your position been? Well, I don't know if they would have had to access it. We would have just made copies of the documents. We had the perfect capability of doing it. That's why I was going back to this joint computer system. They didn't control it. They didn't have exclusive control over it. We ran those files. You would have given it to them. You would have given them the information on it, correct? Whatever the discovery request asked for. So what's the harm here for them accessing it themselves? Because the files created after August the 7th, they would not necessarily have to... I'm talking about September 6th. You said there was an order that you, Moser, had operated on his own. The injunction, yes. That was September 6th, yes. I'm sorry. I'm not sure I see the difference between you handing over the data and them accessing them, particularly since you said we're challenging the validity of this separation agreement. We wouldn't have handed over all the data. For example, there was communications with me. It's attorney-client communications. There's new files. There's new documents that we're creating. Attorney-client group. Yes. Forget about attorney-client group. Just the basic workings of the company. He started his own business. He was working with other companies. There are a lot of those documents that are confidential that had nothing to do with this litigation. And if they were, they would have been produced pursuant to a privilege order. But I disagree with this as being a discovery issue. It was a discovery issue insofar as there's an injunction that has come out that they're challenging in the use of the documents. In that sense, I see this as being some kind of discovery issue. But wholly separate from the discovery issue is the question of whether a party can declare a joint venture dead, can then go and get the powers of the federal judiciary involved, have an injunction issued to have their version of that separation enforced, to then issue a letter to me and to my client threatening them with contempt if they did anything on behalf of RCM Biothink, then after that go and access my computer server without telling me, without telling my client, and download all the files, and then in response to a discovery request, not produce it, and only produce it after it's found out in the course of a deposition. Well, but the main issue is whether the injunction and the summary judgment is sustainable and whether or not they should or shouldn't have done it. There's testimony by Mr. Murphy that it was done pursuant to a litigation hold order. And the district court judge basically discredited that. And yet, isn't that an issue of credibility, an issue of fact? And isn't there something to be said for the idea that if it was legitimately and truly pursuant to a discovery right based upon the hold letter, doesn't there have to be a determination as to whether that does then permit or authorize the treatment of these documents in this fact pattern where there is confusion as to the joint nature? I mean, your colleague is correct that my analogy to my house and the invasion of my house is really not correct because it was arguably a joint house. So given that and given a belief if Mr. Murphy is credited, aren't there facts here that need to be decided? Doesn't the court have to have some further understanding and ruling as to whether Mr. Murphy's testimony should be credited? I think there's three questions in that, Your Honor, and I will, without belaying it. You can pick any one. Okay. Well, first is the question of the joint system. The joint system is simply that there's a VPN connection that allows them to get there. There is no question that that data server belonged to RCM Digesters. They have admitted there's nothing in the record contradicting it. That is their system. There's a tube in there that was not being used after August 27th. No business being transacted between the parties on that. It just existed. They were talking about how it disconnected. Our guys had to go in and just disconnect it on our own eventually. That's a fact. Secondly, the question of Mr. Murphy's testimony, which is some ambiguous statement in the course of the deposition given well after the discovery of the copying. There's two responses. First, I believe that Mr. Murphy's subjective viewpoint on this is not relevant when he gives an order to go into another adversary's computer system and copy data from that computer system. Whether or not the VPN exists or not, whatever that mechanism is, whether he thinks he should or not is irrelevant to the fact that it's illegal to go into somebody else's computer system. There's no question Mr. Moser and because they said it was somebody else's, the parties have agreed on it. But you're saying it wasn't. You're saying the separation agreement wasn't valid. I'm getting back to Judge Fischer's point. We're adding questions before I finish the second one, but on the separation agreement. And the district court did not say that it was valid. Again, I think we're toying with the term separation agreement. There's a paper document, a two-page document that's called separation agreement. He said whether or not that piece of paper embodies the separation is in question. Whether the parties agreed to separate on August 7th is not in question. As Judge Homan said, it's the one issue that all the parties agree on. But ownership may not necessarily equate with permission or there may be ambiguities or issues of fact. But regardless, after that date, under any view of property law or viewing that server out there, it belonged to RCM Digesters. There's no legal theory by which you could say that they still own those servers. At a minimum, they abandoned it. If they ever had any legal title to it, they abandoned it. To this day, they've never claimed ownership to it. They've not done a single activity to express any sort of dominion over that property. It was Mr. Moser's property. And further, just on Mr. Murphy's testimony, whether that's a question of fact. I said one thing, I'm not so sure it's relevant in light of that. It's simply illegal. And his subjective intent, I'm not sure it gets controlled. But I don't think that any rational fact finder could credit Mr. Murphy's testimony as saying that's the reason that they copied these files. There is no reason that no reasonable fact finder could find Mr. Murphy's testimony credible. Then we have to send it back. No. Because, first of all, Mr. Murphy's subjective intent, particularly as expressed at that point, would not decide the matter. In other words, I may think I have a right to go into your room to take your files, but that doesn't mean that I'm entitled to. Mr. Murphy was not entitled to go into Mr. Moser's servers and take files from that server, no more than if he had a key, as Judge Hillman said, to walk into his office at night and start copying files, simply because this paper document was still being contested. From a matter of practice or procedure for future district judges, you got to this posture by amending your counterclaim and adding these anti-hacking claims. As Judge Sirica asked earlier, I mean, is this the way we want discovery matters and electronic discovery to be operating? Or would it have been more appropriate for you to have filed a motion for sanctions? And had that determination made, and then of course we wouldn't have this question here. It could be decided after the case was over. Well, I think there's two parts of that. One is that we did file a motion for sanctions, and that issue was addressed in the context of discovery. Why shouldn't the district court have dealt with the motion for sanctions and stricken your counterclaim? Stricken our counterclaim? Yes. Why would our counterclaim be stricken? Well, because your counterclaim was... I don't want to accept the fact that the federal rules can preempt state law. But in discovery disputes like this, maybe there is some similar argument that courts should treat these as discovery matters and not separate state law violations. Well, I believe there was a discovery violation in the sense that at least we argued to Judge Schneider that they went and self-helped themselves to the documents in the context of litigation. What Judge Schneider found, and the reason that he didn't impose discovery sanctions, was that he said he wasn't done for litigation purposes. Judge Schneider concluded it was done for business purposes. And so it's done for business purposes. There's no discovery sanction because it's not being done in the context of litigation. That was Judge Schneider's ruling. He did issue sanctions for the failure of the plaintiffs to turn over the documents, and we did get that sanction imposed. But he concluded that because it was done for business purpose, it's not a type of activity that could be handled as a discovery sanction. And that, in fact, as he said, I'm not prejudging the legal merits of the case. So we then had to go to Judge Hillman and say, based on this record, Your Honor, there is no way that these people are entitled to go into our system after suing us, after getting an injunction from you, not telling us, downloading all these documents, and then hiding them. But a district judge has the final say. Well, he did, and he did have the final say. No, no, on discovery issues, the district judge has the final say. Well, I guess I don't disagree with Judge Schneider, and we didn't ask for further opinion on his ruling that this was done for business purposes. I think it was. We have not seen any evidence that the biothank parties, the Computer Counterclaim Defense, spoke to their counsel before doing this. They seem to have done it on their own. There's a plethora of emails that are in the record that discusses what was going on at that time. It had nothing to do with discovery. It seems that there's been a heck of a lot of litigation, and you haven't gotten to the main thing, which is separating the companies and figuring out who owns what and who owes what. We're trying to get there, Your Honor. We had actually asked to expedite this appeal. We weren't successful at that, but we would like to move this along. Very good. Any other questions? Thank you, Mr. Duden. Thank you. Mr. Grannon. Yes, I have a few quick points. The problem below, I think, where the district court went awry is there were very murky facts as to what happened. The district court focused solely on, I think, a series of emails for a two-week period where some of my clients' technical IT people and marketing people made the data available. And the error, I think, from a factual standpoint, was to completely ignore Mr. Moser's conduct. Because frankly, Your Honor, the record's clear that the only agreement that existed was the written separation agreement. And if that doesn't exist, I don't know what other agreement exists there because there isn't one. And we're now in the, as I described in the injunction hearing in September of 2006, there's a paradox. What do you do? And the problem that my clients faced was Mr. Moser had, at that point in time, repudiated the separation agreement. We've attached his emails where he says, there is no agreement. I'm proceeding as RCM Biothane. That's what he said up until September 29th, when he then pivoted and said, I'm winding it down. But even if he's winding it down, he is transacting businesses as RCM Biothane, in which event we would have the right and obligation to preserve that data. And so I think the district court did err on fact-finding. And I respectfully submit, Your Honors, that if we turn facts like this into state law causes of action, you will see a lot of cases like this. And there was a contempt or sanction motion that was dealt with that should have been adequate to deal with the issue rather than creating new causes of action for conduct litigants take during the course of litigation. Whether that's a ruling that you'll make, whether that's an extension of litigation privilege, supremacy, however it cuts, I think the court should give some direction on this issue so that you don't have a whole slew of cases like this in the future. Gentlemen, I assume this case went through our pellet mediation program. You are correct. Thank you very much, Your Honors. Thank you very much. We thank counsel for a very helpful argument. The case will be taken under advisement.